UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| DARRELL WAYNE DYER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 4:07CV02105 AGF |
| | ) | |
| DON BLANKENSHIP, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM AND ORDER</u>

This matter is before the Court[1] on the Motion for Summary Judgment (Doc. 108)

filed by Defendants Donald Blankenship, William Scott Jones, the City of Doolittle, Greg

Curtis, and Michael Kirn.  Plaintiffs Kevin Dyer and Darrell Wayne Dyer, assert claims

arising out of the death of Keith Dyer, that occurred at the time of his arrest.[2]  In the first

amended complaint, Darrell Dyer, Keith's father, seeks damages under 42 U.S.C. §§

1983, 1985, and 1986, and equitable relief under 42 U.S.C. §§ 2201 and 2202, for

violations of Keith's constitutional rights.  He also asserts claims for wrongful death and

negligent hiring.  Plaintiff Kevin Dyer, Keith's brother, asserts a claim under § 1983 for

deprivation of his familial relationship.  (Doc. 60.)  Defendants move for summary

---

[1]     This case was transferred to the undersigned United States District Judge in
September 2010, following extensive pretrial proceedings before the prior District Judge.

[2]     Because they share the same last name, the Court shall refer to Darrell Dyer
and Kevin Dyer by their first names, or as Plaintiffs, and shall refer to the decedent, Keith
Dyer, as Keith.

judgment, pursuant to Federal Rule of Civil Procedure 56(a), on all of Plaintiffs' claims. For the reasons set forth below, the Court will grant Defendants' motion, in part.

## RELEVANT FACTS

The record in this case establishes the following facts.[3]  On September 8, 2004, Keith was convicted in Phelps County of the crimes of possession of methamphetamine, possession of a controlled substance and narcotic equipment, and resisting arrest.  On September 15, 2005, he began serving a term of six years in the Missouri Department of Corrections.

On October 4, 2006, at 9:07 a.m., Keith signed out of the St. Louis Community Release Center but failed to return at his scheduled time of 1:00 p.m., and an Absconder Warrant was issued.

Although Kevin knew Keith was living in a halfway house in St. Louis, Missouri, on October 6, 2006, at approximately 2:00 a.m., Kevin picked up Keith at the McDonald's in Rolla, Missouri.  They returned to Kevin's home in Newburg, Missouri, and remained there until approximately 7:00 or 8:00 a.m.  Kevin then took Keith to Keith's attorney's office to pick up a check from a car accident settlement that the attorney was holding for Keith, and took Keith to the bank to cash the check.

Kevin and his girlfriend, Regina Lawson, and Keith went to a car lot in Doolittle, Missouri, where Keith purchased a silver Hyundai Tiburon ("Tiburon"), with the money from his settlement check.  Neither Keith nor Kevin had a driver's license, so Regina was

_____

[3]    The facts recited herein have not been properly controverted, except as otherwise indicated.

2

listed on the title as co-owner with Keith.  In return, Keith told Regina that she would get the car because he was going back to jail.[4]  Regina later learned that Keith had left the halfway house in St. Louis without permission.

At approximately 2:30 p.m., Keith wanted to take the Tiburon to find one of his friends, Larry Bramel.  Kevin objected because, according to Kevin, Bramel was a drug dealer and user, and he had seen Bramel use methamphetamine on numerous occasions. Kevin assumed that if Keith met with Bramel, they would take drugs.  Regina did not want Keith to take the Tiburon because her name was on the title and Keith was not supposed to drive it yet, and because of Keith's erratic behavior.

Nevertheless, Keith left in the Tiburon to find Bramel.  After he left, Regina and Kevin were worried that something might happen to the car, for which Regina might be held responsible.  Later that day, Kevin also learned that Keith had left the halfway house without permission and would be arrested for violating his parole.

---

[4]Plaintiffs challenge this statement, as well as approximately 90 other statements, contained in Defendants' Statement of Undisputed Facts, by stating that "Plaintiffs are without sufficient information to form a belief as to this allegation and, therefore, deny same."  Facts set forth for the purpose of a motion for summary judgment are deemed admitted unless controverted by the opposing party.  Fed. R. Civ. P. 56(e); Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).  The non-moving party may not rest on the allegations in its pleadings, or on mere denials or allegations, but by affidavit and other evidence must set forth specific facts showing that a genuine issue of material fact exists.  Fed. R. Civ. P. 56(e); Hernandez v. Jarman, 340 F.3d 617, 622 (8th Cir. 2003); Herring v. Can. Life Assur. Co., 207 F.3d 1026, 1029 (8th Cir. 2000); Allen v. Entergy Corp., 181 F.3d 902, 904 (8th Cir. 1999).  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Plaintiffs' blanket denial does not controvert the evidence presented by Defendants, and fails to comply with E.D. L.R. 7-4.01(E).  The Court therefore deems facts denied in such a manner as admitted.

Sometime around 5:00 or 6:00 p.m., Kevin and Regina found Keith, but he refused to give them the car.  Regina then called the Newburg Police Department and reported the car as stolen.  She explained to the police that it was not legal for Keith to drive the car because they could not get insurance for the car until Monday, October 8th.

When Keith arrived at Bramel's house, Jessica Van Pel, Bramel's girlfriend, was already there.  Keith waited with Van Pel for approximately three hours for Bramel to return home.  Van Pel noted that Keith seemed nervous.  Although she had never seen Keith use methamphetamine, Van Pel had seen him when he was "under the influence," and, on occasion, had helped him "come down" by "feeding him and making him drink a glass of water and just sit."

Meanwhile, at 7:30 p.m. that evening, the Newburg Chief of Police called the Doolittle Chief of Police, Defendant William Scott Jones ("Jones"), asking if Jones knew Keith Dyer, and requesting Jones' assistance with an investigation into whether Keith had stolen a vehicle.  Jones had been the Chief of Police in Doolittle, Missouri, since August 1, 2006, and was the only police officer in the Doolittle Police Department.  Jones knew Keith and had arrested him on more than one occasion for warrant violations when Jones was a Newburg police officer.

Later, the Newburg Chief of Police met with Jones at the Doolittle Police Department and advised Jones that Keith was wanted for stealing a 2000 gray Hyundai Tiburon.  According to Jones, Keith had a reputation in Newburg and Doolittle as a violent person and a drug user.  Keith had resisted arrest on other prior occasions when Jones had attempted to arrest him and he had to call for backup.

Approximately 20 to 30 minutes after Bramel arrived at the house, Keith and Bramel decided to take a drive. Bramel drove because Keith did not have a driver's license. According to Bramel, during the drive into Newburg, he learned that the Tiburon he was driving had been reported as stolen.

Bramel drove through Newburg and went to "Cookin' From Scratch," a restaurant/gas station/convenience store in Doolittle, Missouri. Cookin' From Scratch had video surveillance cameras that recorded all actions in the front of the property where the gas pumps were located. Bramel pulled up to pump 7. Brad West, another friend of Keith's, arrived at Cookin' From Scratch with Ken Baker and Tim Baker, and parked his green Dodge Ram pickup near the store and away from the pumps. West stopped at Cookin' From Scratch because he had seen Joey Loeffelmann, one of his friends. West went over to speak to Loeffelmann, who was putting gas in his white Chevy Blazer. At approximately 11:45 p.m., Loeffelmann is seen in the surveillance video wearing a white shirt and standing by a white Chevy Blazer.[5]

At approximately 11:30 p.m., Donna Lawson ("Ms. Lawson"), the mother of Regina Lawson, had ended her evening shift at Phelps County Regional Medical Center and drove to Cookin' From Scratch. She parked at the gas pump, where she can be seen on the video at approximately 11:45 p.m. She saw Keith arrive, and called Regina to let her know that Keith was there with the car.

---

[5] The recorded time on the Cookin' From Scratch surveillance video was not synchronized with that of the dispatch recordings, so there is a discrepancy in the time stamp of the video as compared to the dispatch recordings.

West also saw Bramel drive up to the gas pump with Keith in the front passenger seat, and went over to talk to Keith. West said, "What's up, man? I haven't seen you in a while." When West walked up and touched Keith's passenger door, Keith warned him "to get the fuck away." West then turned around to walk away when Keith, who had a white T-shirt wrapped around his neck, jumped out of the car and punched West on the back of the head, causing him to fall to the ground. West had never seen Keith act like that before, and he jumped up and ran away from Keith. West can be seen on the video, at approximately 11:45, running, with Keith in pursuit. Keith then started scuffling and throwing punches at the Bakers, who fought back. During the scuffle, Keith either removed or lost his white T-shirt.

While these events were on-going, Jones was on patrol. He passed by the Cookin' From Scratch gas station and observed two males fighting. Jones returned to the gas station and observed a white male without a shirt fleeing the scene. While the altercation between Keith and the Bakers was on-going, other people outside of Cookin' From Scratch began yelling that a Doolittle police officer was pulling up. When Bramel saw the police car arrive, he told Keith to run so he would not be arrested. Bramel already knew that the Tiburon had been reported stolen, and Regina had told him earlier that there was a warrant for Keith's arrest for leaving the halfway house without permission. At approximately 11:45 p.m., Keith is seen on the video surveillance footage wearing jeans and no shirt. Keith ran into the woods, toward a ravine behind the gas station.

In his deposition, West testified that Keith was "acting differently" and he had never seen Keith act in such a manner. Ms. Lawson also testified that Keith had always

been very respectful to her whenever they met, but that night, although she repeatedly told Keith to calm down, he refused to do so. She stated, "It was like he snapped."

Jones drove around to the back of Cookin' From Scratch with his headlights and emergency lights on, and observed that the fleeing suspect was Keith. Keith picked up a large rock and threw it at Jones' police car. He then picked up a second rock, threw it at the car, and fled towards a drainage ditch. Jones pursued him, advising dispatch that he was in foot pursuit.

**The Arrest**

 Because it was the middle of the night, Jones could not see anything in the area where he was pursuing Keith. Jones identified himself and ordered Keith to stop, but Keith continued running. Jones then used his chemical defense spray, but it had no effect on Keith. Keith was running down the ditch line when he stopped and started throwing rocks at Jones. When one of the rocks almost hit Jones in the head, he unstrapped his gun and advised Keith to drop the rock in his hand. Keith was attempting to run up an incline when Jones tackled him and they both fell to the ground. Keith proceeded to punch Jones on his right side and kicked him with his knees. Jones and Keith struggled on the ground and Jones put his right forearm on Keith's chest to keep him from getting up.

Jones repeatedly ordered Keith to stop resisting, but he continued to punch Jones in his chest and back. Keith yelled, "Get the fuck off me or I'll kill you, you son of a bitch," and then immediately became more vicious and struck Jones harder. Jones was able to place one handcuff on Keith's left wrist, but Keith struck him again in the right arm and ribcage. Although Jones continued to struggle with Keith, he was eventually

able to handcuff Keith's right wrist, although his hands were handcuffed in front, and not behind his back. Approximately two minutes into their struggle, Jones began to suspect that Keith was under the influence of some kind of illegal narcotic.

Jones located his radio and advised dispatch that he needed backup in the woods behind Cookin' From Scratch. He advised that he had handcuffed Keith, but that Keith was still fighting back. A dispatch went out stating that Jones was in foot pursuit of a subject and requesting any deputy in the vicinity to respond to assist. A short time thereafter, dispatch stated that five or six shots had been fired. Because of the belief that shots had been fired, an ambulance was dispatched to Cookin' From Scratch and a Life Line helicopter was placed on standby.

At approximately 11:46 p.m., Defendant Greg Curtis ("Curtis"), a Phelps County Sheriff's Deputy, received a dispatch stating that Jones was in foot pursuit of a subject and requesting any deputy in the vicinity to respond to assist. Curtis heard dispatch advise the location was in Doolittle, and later heard dispatch state that five or six shots had been fired. Jones had been able to key his mic and, although he did not respond to questions, Jones reported that he was still struggling with the subject.

At approximately 11:47 p.m., Defendant Michael Kirn ("Kirn"), also a Phelps County Sheriff's Deputy, responded to a dispatch call that Jones was in need of assistance at Cookin' From Scratch in Doolittle, and was engaged in a physical altercation while attempting to arrest Keith Dyer. While Kirn was driving to the scene, dispatch advised that "six shots were fired but they were unable to advise who had fired the shots and if anyone had been injured." Kirn had arrested Keith before and had

assisted on numerous other occasions when Keith was arrested for trespassing or theft. Kirn knew that Keith had a reputation for being violent and using illegal drugs. Trooper Jonathan Cluver of the Missouri Highway Patrol also received notice of the incident, and was advised that the subject was in custody but still combative.

The Phelps County Sheriff's Department ("PCSD") and the Missouri Highway Patrol had overlapping jurisdiction with the City of Doolittle, and the PCSD routinely assisted Jones with arrests in the Doolittle/Newburg area.

Meanwhile, Keith continued to strike Jones, who used his expandable baton on Keith's left arm and chest to stop Keith from hitting him. Keith continued to strike Jones with his knees and hands, and attempted to bite and spit on him. Jones heard voices calling, asking where he was, and he yelled back. Curtis and Kirn then arrived to assist.

Upon arriving at Cookin' From Scratch, Curtis and Kirn had been directed to proceed towards the drainage ditch. As Kirn approached the ditch, he heard Jones struggling with Keith. When Kirn arrived near the ditch, Jones was out of breath and appeared physically exhausted from struggling with Keith. When Curtis and Kirn were finally able to see Jones, he was attempting to hold Keith down, with Keith lying on his stomach. The testimony is conflicting as to whether, at this point, Jones was straddling Keith's back, was lying over Keith's back, or lying to the right of Keith. Curtis also saw that Jones was breathing "extremely heavily."

Kirn assisted Jones in getting off of Keith, and then Curtis and Kirn took over attempting to control Keith, although Jones told them that Keith "would not quit fighting." Kirn took a position with the bulk of his body on the south side of Keith's

body, and his left leg over Keith's rear-end, and Curtis pressed down on Keith's left upper shoulder.

Although Keith was handcuffed in front, with his hands over his head, he continued to try and get up off the ground. Keith grabbed Curtis and pulled him down. At this point, Curtis did not know if there was a weapon involved and whether Keith might have that weapon. Kirn believed that there was a gun involved and that it was possibly underneath Keith. When Keith pushed up from the ground and attempted to roll over on his left side to face Curtis, Curtis hit Keith with a single closed-hand blow to the side of Keith's head, causing Keith to fall back and release Curtis. Keith repeated this same attempt to roll over four or five times and each time, Curtis would strike a single blow to Keith's face, but Keith continued trying to roll over.

Kirn's intention was to re-handcuff Keith with his hands behind his back. This prevents a suspect from striking out with his fists, thereby decreasing the level of danger to the officers, even though the suspect may still continue to resist. Keith immediately pushed up off the ground, rolled the upper half of his body to the right, and, facing Kirn, told him, "I'm going to kill you, motherfucker." Kirn told Keith to stop resisting, and, because Kirn was situated on Keith's right side, put his left foot on the ground and his left leg over Keith's rear-end while he reached up to grab Keith's hands. Kirn grabbed Keith's handcuffs in an attempt to control him, but Keith grabbed Kirn's left wrist and tried to pull Kirn over. Kirn struck Keith on the right side of Keith's head and Keith released Kirn's wrist. Keith then started to curl up and roll over onto his back, which

concerned Kirn because he did not know if Keith had a gun. Kirn rolled Keith back onto his stomach, but Keith started to kick Kirn in his back.

Kirn asked dispatch to locate an officer with leg shackles. In his deposition, Kirn stated that Keith had always been respectful, but that night he was highly agitated and acting different than usual. Kirn was still focused on finding the gun he believed Keith possessed, based on the dispatch alert of shots fired. Keith twisted around, lifted up on his elbows and stated again, "I'm going to kill you, motherfucker." When Keith grabbed the front of Kirn's jacket and pulled him down, Kirn struck Keith in the head with his hand so that Keith would release him. Throughout the entire altercation, Kirn repeatedly told Keith to stop resisting arrest. Kirn never put his weight on Keith's back. Kirn and Curtis rolled Keith onto his stomach. Kirn did not believe there was any breathing problem at that time, because Keith was growling nonstop, unlike Jones, whose labored breathing Kirn could hear.

Kirn asked Jones to go to his patrol car and get his leg irons, and Jones returned to the parking lot but could not find his leg shackles. Jones then saw Ronald Dishman, a bail bondsman from Doolittle, in the parking lot. Dishman had been licensed by the State of Missouri as a bail bondsman since 2001, and had undergone 24 hours of required state basic training, in addition to the eight hours of continuing education training he was required to undergo every two years. Bail bondsman training includes such topics as handcuffing techniques, the use of mace, searches, seizures, and arrests. Dishman had also been a volunteer "first responder" for the Doolittle Fire Department since 2001, which required him to take first aid courses and learn basic life saving techniques. On the

night of October 6, 2006, Dishman had gone to Cookin' From Scratch after hearing a dispatch call stating that first responders were needed for a gunshot wound. Dishman noted that Jones was breathing heavily, leaning against the back of his vehicle, and his glasses were gone, he was sweating, he was visibly worn out, and his uniform was dirty like he had been wrestling around. Dishman asked Jones where the suspect and officers were because it was so dark and he could not see.

After determining that Dishman had a pair of leg shackles, Jones and Dishman returned with the leg shackles to where the two deputies were still trying to subdue Keith. As Dishman approached the woods, he could hear fighting and screaming. He heard Curtis yelling commands to "stop fighting," and when he arrived at the scene, he saw Curtis and Kirn fighting with Keith. Dishman saw that Keith was struggling and trying to pull away from the two deputies, and was thrashing around, rolling from his right side to his left.

As the two deputies were holding Keith's arms, Dishman saw that Keith's right handcuff was twisted, like it was turned backwards. Neither of the deputies was lying on top of Keith. Both deputies were yelling at Keith to stop resisting and stop fighting, and Curtis kept telling Keith to "quit it." Dishman heard Keith screaming and fighting, but did not observe that Keith's breathing was labored. Keith did not comply with any of the commands given by the two deputies.

At this point, Dishman placed the leg shackles on Keith. There is conflicting testimony regarding whether, at the time the leg shackles were applied, Keith was still struggling, and whether he continued to struggle after the leg shackles were applied.

Curtis and Kirn, assisted by Jones and Dishman, were able to remove the handcuffs from the front of Keith and handcuff him behind his back. Jones saw scratches on Keith's face, but did not see any blood or indication of any serious physical injuries. Kirn asked if anyone had a patrol car with a cage, at which point Jones returned to get his patrol car in the parking lot.

After Keith was finally secured with the leg shackles and was re-handcuffed, Curtis squatted next to Keith, placed his left knee in the small of Keith's back below his hands, and then placed his left hand on Keith's hands in order to search Keith for a weapon. Curtis believed that Keith could have a weapon concealed in his pants pocket, his waistline, or underneath his stomach or chest. After completing his search, Curtis stood up, but remained close to Keith's left side.

After Keith was finally secured, Kirn noticed that several Missouri State Highway Patrolmen were present. Upon arriving at the drainage ditch, Trooper Cluver heard someone say "relax," and he thereafter observed that Keith was on his stomach and his hands were secured behind his back in handcuffs. Trooper Donald Johnson also arrived at the drainage ditch. At approximately 11:59 p.m., dispatch was advised that the scene was secured.

One of the patrolmen then remarked that Keith did not look well and that he appeared to be having trouble breathing. Curtis rolled Keith onto his left side, but he did not appear to be breathing. Kirn looked at Keith and saw that his lips were turning an ashy color; he heard Keith gasp and then stop breathing. Kirn described Keith's last breaths as agonal breaths. Curtis also heard Keith take a gasping-type breath and then

13

Keith did not breathe for several seconds. One of the patrolmen checked Keith and found a weak pulse, and he immediately rubbed Keith's sternum, but there was no noticeable response.

At approximately 12:00 a.m., Kirn advised dispatch that the subject was not responding and asked that they send an ambulance. However, an ambulance was already on the scene at the Cookin' From Scratch parking lot. Keith's handcuffs were removed. By the time Jones returned in his patrol car, Keith was no longer handcuffed and had stopped breathing. The paramedics from the waiting ambulance arrived and gave Keith CPR, and continued to administer CPR while transporting him to Phelps County Regional Medical Center. At 12:27 a.m. on October 7, 2006, Keith was pronounced dead.

The Missouri Highway Patrol began an immediate investigation. Curtis and Kirn were tested for alcohol and drugs, and were found to be negative for both. Jones was still at Cookin' From Scratch when he was informed that Keith had died. One of the Missouri Highway patrolmen notified Jones that investigators were arriving and Jones advised him that the owner of Cookin' From Scratch had video surveillance that, most likely, had captured the original altercation.

At this point, Kirn asked Jones how many rounds had been fired, and told him that dispatch had broadcast that rounds were fired. Jones stated that no rounds had been fired, but that he had told the dispatcher that Keith was throwing rocks. One of the Phelps County deputies who arrived late to the scene prepared an Incident Report and speculated that the dispatch report of "shots fired" may have been a misunderstanding by the dispatcher because Jones has a speech impediment.

Jones then went to clean the blood off his arms. During the altercation with Keith, Jones' glasses were broken, his watch was broken and the glass face shattered, his whistle chain was broken, his uniform was torn, and his handheld radio "mic" was broken. He was also later treated for a swollen left wrist with cuts and abrasions, cuts on the left hand, cuts on three of the right hand fingers, bruises, knots on the head, a swollen left knee with cuts, abrasions, and bruising, cuts on the right knee, and sore left and right shoulders.

Early on October 7, 2006, Kevin arrived at the scene. After waiting an hour in the parking lot, he started to walk towards the woods where he had been told Keith was. A "sheriff" told Kevin to stop, pointed a gun at his chest, and told him "Don't take another step," or he would shoot. Kevin assumed the officer who put the gun to his chest was from the PCSD; he knew it was not a City of Doolittle officer because he knew Jones.

Kevin agreed to make a written statement about the events of the night of October 6-7, 2006. Kevin's written statement did not include the alleged fact that an officer pointed a gun at him. When questioned at his deposition as to why he did not make a statement about an officer pointing a gun at him, Kevin stated that one of his reasons was that "when [pointing a gun] becomes . . . a norm to somebody, it just, kind of gets blown off, especially in a circumstance like this." Kirn testified the he has never, at any time, pointed a gun at Kevin, and Curtis did not remember seeing anyone point a gun at Kevin on the night in question.

**Post-Mortem Examination and Pathology Findings**

The post-mortem examination revealed that Keith had numerous contusions and abrasions on his wrists, elbows, chest, back, knees, hands, left upper arm, face, and scalp, but no brain injury of any kind. The day after his death, Keith's heart weighed 380 grams and was found to be abnormal due to left ventricle hypertrophy, with the enlarged left ventricle measuring 20 millimeters and the right measuring 6.

Keith's cranial cavity showed surface contusions, but there were no fractures or other injuries present, and no brain injury was detected. Keith's toxicology report showed blood screens of .05 gm % of alcohol/ethanol, 1.4 mg/ml of methamphetamine, and .012 mg/ml of cocaine metabolite. Keith's urine screening showed 3.6 mg/ml of cocaine metabolite, greater than 5 mg/ml of methamphetamine, and .36 mg/ml of amphetamine. The vitreous screening showed .08 gm % of alcohol/ethanol and .28 mg/ml of cocaine metabolite. The medical examiner also reported "petechial hemorrhages of lungs." Plaintiffs allege that petechial hemorrhages are "an important sign of asphyxia caused by some external means of obstruction of the airways."

The assistant medical examiner determined that the manner of Keith's death was an "accident" due to "excited delirium associated with cocaine and methamphetamine."

**Officers' Training and Guidelines**

**1. Jones and City of Doolittle**

Prior to becoming Chief of Police in Doolittle, Missouri, on August 1, 2006, Jones had worked in security services for many years. He had previously served as a police officer and then Chief of Police in Newburg, Missouri, and had previously served as a

police officer in Dixon, Missouri.  He graduated from the Mineral Area Law Enforcement Academy in 2001, where he was required to complete 800 Police Officer Standard Training ("POST") hours.  He was required to attend 48 hours of POST continuing education classes every three years, and he completed an additional 20 to 30 hours of training each year.

Jones received training on positional asphyxia and was taught not to put anyone in a position that blocks the airways.  He stated that the use of force is determined by the situation, and every situation dictates different actions, with different variables.  The accepted procedure for handcuffing is to handcuff a person with his hands behind his back.  The City of Doolittle did not have any policies or procedures in place governing the use of force at the time of the incident in question, but is currently putting them in place.  However, Jones learned about restraint asphyxia, excited delirium, and sudden in-custody death syndrome, while at the academy.

Jones stated that, in his experience, someone who had taken methamphetamine would generally be excited, fighting, and more physically aggressive.  After an arrest, Jones was trained to make sure the suspect was breathing, make sure no airway was blocked, look for any physical signs that something was wrong, check whatever the suspect may complain about, and watch for physical changes.  Jones stated that if he saw any visual signs of a problem while making an arrest, he would immediately call for a paramedic and ambulance.

On one occasion in his law enforcement career, Jones was accused of using excessive force when he used a chemical spray to subdue a resisting suspect; however, he was not disciplined for that action.

## 2. **Phelps County**

<u>Deputy Curtis</u>

At the time of the incident in question, Curtis had worked for the PCSD since 2003. He graduated from the Law Enforcement Training Institute in Columbia, Missouri, which is POST certified, in 2002. Under POST, the State of Missouri sets the requirements for law enforcement officers, requiring specific training and continuing education. Curtis attended POST continuing education courses, in addition to internal training at the PCSD.

Curtis stated that striking a subject in the head would fall under the category of necessary force to gain control of that person. He was trained that it would be acceptable for an officer to strike a suspect in the head after the suspect was handcuffed, if the situation necessitated the use of such force. In one of his classes, there was a discussion about striking a suspect in the face with the hand. One of the reasons striking a suspect in the head is not commonly done is due to the risk of the officer breaking his hand because the face has so many bones and is harder than the hand. In the course of his duties as a Phelps County deputy, and when the situation was warranted, Curtis has struck a suspect in the face somewhere between five and ten times, including Keith Dyer. As far as he was aware, no complaints were ever made after the occasions of him striking the subjects in the face.

Following Keith's death, Curtis received training about excited delirium, as well as positional or restraint asphyxia. As a deputy with the PCSD, Curtis has used leg shackles approximately 20 to 30 times. He stated that it is very common for suspects to continue to fight until they are handcuffed behind the back.

As a Phelps County deputy, Curtis has never received any complaints for the use of excessive force. The incident with Keith Dyer was the first time Curtis had arrested someone who died after being taken into custody.

Deputy Kirn

At the time of the incident in question, Kirn had been a Phelps County deputy since 2000. He graduated from St. Charles Police Academy and received his POST certification in 1994. While at the Academy, Kirn learned about positional or restraint asphyxia. Prior to joining the department, Kirn had worked as a police officer for various municipalities since 1994.

Kirn was trained that the proper amount of force used in arresting someone is dictated by the amount of force necessary to bring the situation under control. While Kirn acknowledged that he had not received training that it was permissible to punch a suspect in the face, or on how to strike someone in the face, he had received training on how to strike someone using a closed fist. Kirn believed that striking a suspect in the head with a closed fist was the use of lethal force.

On approximately five prior occasions, Kirn punched a suspect in the head in order to make an arrest. On one prior occasion, when a suspect with a knife was

attempting to stab him, Kirn struck the suspect in the head with a closed fist six or seven times. On that occasion, the suspect suffered only swelling.

Kirn believed that he had a responsibility for the safety of the general public and the person he was pursuing. He was familiar with positional or restraint asphyxia and was taught that under certain circumstances, if pressure is put on a subject's chest, it may restrict the subject's ability to breathe, such that Kirn had to be aware of what he was doing. He was trained that the safest position to subdue a combative suspect who is resisting arrest is to get him face down on the ground in a prone position and handcuff the suspect behind his back. If a suspect was still combative, Kirn would use a wrist lock to bring the subject under control, even if the subject was already handcuffed.

Kirn believes that the necessary amount of force to be used is dictated by the situation, with the primary goal being the safety of the people around him, and then the suspect. He has never been disciplined or sued for the use of excessive force.

Sheriff Blankenship

At the time of the incident in question, Defendant Donald Blankenship ("Blankenship") was the Sheriff of the PCSD. However, he was not present during any of the events that occurred on October 6-7, 2006. Blankenship has worked in law enforcement for 33 years, and was the Sheriff for 20 years, from 1989 to 2009. All of Blankenship's continuing education training was POST certified, although he attended a law enforcement academy prior to the implementation of the POST program.

As Sheriff, Blankenship supervised the budget, the law enforcement personnel, the jail, the detectives, and anyone who worked for the PCSD. He was responsible for the

hiring, firing, training, and disciplining of all personnel. He was also responsible for enforcing the laws of the State of Missouri and protecting the citizens of Phelps County, as well as making sure all officers are POST compliant.

Blankenship was the chief policy-making authority for the PCSD. There were no policies and procedures in place when Blankenship first took office. He created and was responsible for establishing and enforcing policies and procedures for the department, which were adopted and approved by the PCSD as its "Standard Operating Guidelines."

The deputies of the PCSD are instructed, supervised, and controlled by the laws of the State of Missouri, and such regulations and policies are set forth in the Standard Operating Guidelines. All PCSD officers are required to attest to the fact that they have read and understood the policies and procedures of the Standard Operating Guidelines. The Standard Operating Guidelines were in place at the time of Keith's death.

The Standard Operating Guidelines state, "It is the policy of this Department that a deputy shall only use that force necessary to effectively bring an incident or subject under control while protecting the lives and safety of the deputy and other persons." However, the PCSD has a policy, custom and practice recognizing the fact that escalating levels of force may need to be used to subdue a violent and combative individual. As stated in the Standard Operating Guidelines:

> A deputy's use of force must be aligned with the concepts and principals of the Department's Use of Force Wheel. The Use of Force Wheel is a conceptual model that is designed to demonstrate to a deputy that reasonable force is fluid in relationship to a subject's actions and may change rapidly without intermediate types of force being used.

The Standard Operating Guidelines recognize varying levels of force that may need to be used, such as controlling force, incapacitating force, and lethal force. The Guidelines state that a deputy may have to use lethal force due to "[t]he necessity to protect the deputy or others from what is reasonably believed to be an imminent threat of death or serious physical injury." The Guidelines also state, "It shall be a violation of these guidelines for any deputy of the Sheriff's Department to use any type of force in excess of that amount necessary in order to complete an arrest or control a subject and/or situation in a manner that is safe to both the deputy(s) and to the public."

In addition to the Standard Operating Guidelines' written policy against excessive force, Blankenship had certain unwritten policies, including the policy to use no more force than absolutely necessary. During his 20 years as Phelps County Sheriff, Blankenship never found any evidence of the use of excessive force by the officers in the PCSD.

Blankenship was familiar with Curtis and Kirn's character, background, and activities, and knew nothing to indicate that either deputy was prone to the use of unnecessary or unreasonable force. Blankenship did not recall any complaints of excessive force being lodged against either Curtis or Kirn.

The Standard Operating Guidelines state that a deputy must exercise due care in order to prevent positional asphyxia if a suspect is hogtied. At the time of his death, Keith's hands were handcuffed and his legs were shackled at the ankles, but he was never hogtied. After being notified of Keith's death, Blankenship asked the Missouri Highway Patrol to perform an investigation.

Blankenship's understanding of excited delirium was that it was a condition of an enlarged heart, and the ingestion of drugs combined with substantial exertion could cause the heart to speed up, go out of rhythm, such that the heart could not get back into its normal rhythm and may cause death.

Blankenship believed that striking a suspect in the face is not the best place to strike, but testified that "if you're striking someone in the face, things are out of control, and you're doing whatever you can just to try to get control," and "if you're wrestling somebody on the ground, that may be the only place that you have available." He stated that when an officer strikes someone in the face with his hand, the officer was "more likely to break [his] hand than do much damage to the face."

Blankenship did not believe that Curtis and Kirn used excessive force while subduing Keith, who he described as violent and combative. Although several lawsuits have recently been filed against the PCSD, none of those lawsuits named or involved Curtis or Kirn. Blankenship also confirmed that both Curtis and Kirn were POST certified and had stayed current with their POST continuing education requirements.

In addition to the POST continuing education requirements, the PCSD also provided internal training to its officers. Following Keith's death, the department training included training on positional asphyxia and excited delirium.

There are many methamphetamine users in Phelps County, and the PCSD has arrested a substantial number of people under the influence of methamphetamine. In Blankenship's experience, methamphetamine users become extremely paranoid, have more violent tendencies and less reaction to pain, don't listen to verbal commands, and

are difficult to deal with, particularly because they keep exerting force because they don't feel the pain that keeps most non-users from continuing to use such force.

Blankenship stated that every arrest is different, and an officer never knows what is going to happen, so an officer has to use his best judgment under the circumstances. Blankenship agreed with Jones' decision to follow and try to apprehend Keith, and he approved of Curtis and Kirn's efforts to re-handcuff Keith behind his back because, when a suspect is cuffed with his hands in front, the suspect still has movement of his arms and may use the handcuffs as a striking weapon.

**Other Incidents Involving PCSD**

The record contains evidence related to other incidents involving the PCSD. In addition to his testimony regarding someone pointing a gun at him on the night of Keith's death, Kevin testified about an incident in May 2008. He had been shot in the leg by someone, and approached Phelps County Sheriff's deputies to tell them about the shooting. In response, the deputies ordered Kevin to get on the ground, which he did. Before Kevin reached the prone position, one of the deputies grabbed him and slammed him in the tailgate of a truck and put a cigarette out on his throat. He testified that on another occasion, Phelps County Sheriff's deputies found him hiding under a bed after he had escaped confinement. After they had already placed him in handcuffs and he had stopped resisting, the deputies sprayed him with mace.

Plaintiffs also offered evidence of incidents involving James Dodds. On one occasion, in the course of a stop, a Phelps County Sheriff's deputy struck Dodds in the side of the head with handcuffs. The deputy then took Dodds to the ground, handcuffed

him behind his back, put his knee in the back of his neck, and pushed his chin down into the concrete. On a different occasion, in the course of an arrest, Phelps County Sheriff's deputies pressed the points of their nightsticks into the back of Dodds' legs after he was subdued. They also rolled their nightsticks around the back of his legs while applying pressure with their knees. On yet another occasion, after Dodds had fled a party being broken up by Phelps County Sheriff's deputies, a deputy punched Dodds in the mouth, in the eye, and in the face. Another time that Dodds tried to evade arrest, a Phelps County Sheriff's deputy arrested Dodds and placed him in the patrol car, then leaned into the back seat where Dodds was seated with handcuffs on, placed his hands under Dodds' chin on both sides of his neck, and squeezed the pressure points around Dodds' windpipe.

## SUMMARY JUDGMENT STANDARD

Rule 56(c)(2) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, a court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the record. Sokol & Assocs., Inc. v. Techsonic Indus., Inc., 495 F.3d 605, 610 (8th Cir. 2007).

The initial burden to establish the absence of material facts is placed on the moving party. City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc., 838 F.2d 268, 273 (8th Cir. 1988) (the moving party has the burden of clearly establishing the non-

existence of any genuine issue of fact that is material to a judgment in its favor). Once discharged, the burden then shifts to the non-moving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on a material factual issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

Once the burden shifts, the non-moving party may not rest on the allegations in its pleadings, or on mere denials or allegations, but by affidavit and other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); Hernandez v. Jarman, 340 F.3d 617, 622 (8th Cir. 2003); Herring v. Can. Life Assur. Co., 207 F.3d 1026, 1029 (8th Cir. 2000); Allen v. Entergy Corp., 181 F.3d 902, 904 (8th Cir. 1999). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). A dispute about a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Herring, 207 F.3d at 1029 (quoting Anderson, 477 U.S. at 248). A party resisting summary judgment has the burden to designate the specific facts that create a triable question of fact. See Crossley v. Georgia-Pacific Corp., 355 F.3d 1112, 1114 (8th Cir. 2004). "Self-serving, conclusory statements without support are not sufficient to defeat summary judgment." Armour and Co., Inc. v. Inver Grove Heights, 2 F.3d 276, 279 (8th Cir. 1993).

## DISCUSSION

**Count I: § 1983 Claim of Excessive Use of Force**

Count I of the First Amended Complaint alleges violations of 42 U.S.C. § 1983 against all Defendants for the use of excessive force in violation of Keith Dyer's constitutional rights. Defendants argue that they are entitled to summary judgment as to Count I because Plaintiff has failed to provide sufficient legal evidence of the use of excessive force.

In an excessive use of force claim, "[t]he dispositive question is whether the amount of force the officer used was objectively reasonable." Shannon v. Koehler, 616 F.3d 855, 862 (8th Cir. 2010) (citing Graham v. Connor, 490 U.S. 386, 396-97, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)). "Reasonableness of a seizure is determined by the totality of the circumstances and must be judged from the viewpoint of a reasonable officer on the scene, irrespective of the officer's underlying intent or motivation." McCoy v. City of Monticello, 342 F.3d 842, 848 (8th Cir. 2003) (citing Graham, 490 U.S. at 396-97). "In turn, the reasonableness of a particular use of force depends on the circumstances of each case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Shannon, 616 F.3d at 862 (internal citations omitted).

"Whether an officer's use of force is reasonable is 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"

McCoy, 342 F.3d at 848  (quoting Graham, 490 U.S. at 396).  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation."  Graham, 490 U.S. at 396-97.

In this case, the Court finds that the use of force against Keith Dyer by Defendants was objectively reasonable and did not violate Keith's constitutional rights.  Jones initially stopped at Cookin' From Scratch after observing Keith's physical altercation with the Bakers and with knowledge of Keith's suspected theft of the Tiburon.  When Jones attempted to arrest Keith, Keith became non-compliant and the events became "tense, uncertain, and rapidly evolving."  Gill v. Maciejewski, 546 F.3d 557, 562 (8th Cir. 2008).  Keith fled from Jones in an attempt to evade arrest, and thereafter continued to resist arrest by Jones and thereafter by Curtis and Kirn.  The evidence in the record indicates that Defendants continuously told Keith to stop resisting, but he refused and violently fought back until moments before he stopped breathing.

The evidence also indicates that Keith posed an immediate threat to the safety of the officers and others.  As stated above, Jones first observed fighting with the Bakers. Keith thereafter violently resisted Defendants' attempts to arrest him.  Keith threw rocks at Jones, punched him repeatedly, and attempted to bite and spit on him.  Even once Keith was handcuffed, Keith continually tried to get up off the ground, and rolled around from left to right trying to pull away from the deputies.  At one point Keith grabbed

Curtis and pulled him down to the ground. He also attempted to pull Kirn down to the ground, and verbally threatened to kill him. Defendants attempted to use various techniques to get Keith under control: Jones sprayed Keith with chemical defense spray and handcuffed him, Curtis hit Keith with four to five closed-hand blows, Kirn struck Keith in the head with his hand, and ankle restraints were applied. None of these techniques had any effect on Keith, and it ultimately took three men to get handcuffs and ankle restraints on Keith.

On this record, the evidence as to the force used is largely undisputed, and supports a conclusion that Defendants Jones, Curtis and Kirn each used a minimal amount of force that was reasonable under the circumstances. While there is some evidence that Jones was actually straddling Keith's back at some point in time, this evidence does not make the force used unreasonable, considering their initial struggle and Keith's continued resistence. It is also clear that Keith continued both to breathe and to resist, actively, after any straddling by Jones. There is also some conflicting evidence that Keith stopped struggling when the ankle restraints were applied, but this observation was made almost immediately before one of the patrolmen remarked that Keith did not look well and that it appeared that Keith was having trouble breathing. Moreover, during this time period, Kirn was reasonably engaged in confirming that Keith did not have a weapon. As soon as they noticed that Keith had stopped breathing, the officers applied a sternum rub on Keith and called for medical assistance from the nearby ambulance. Evidence that Keith had stopped struggling, therefore, does not make the force used

unreasonable, considering the short amount of time between when Keith allegedly stopped struggling and when he thereafter stopped breathing.

As such, the Court concludes that Defendants have established on these facts that the use of force against Keith by the Defendants was objectively reasonable and did not violate Keith's constitutional rights. This conclusion is consistent with Eighth Circuit case law.[6] See, e.g., Brandt v. Davis, 191 F.3d 887, 889, 891-92 (8th Cir. 1999) (finding that it was reasonable for officers to hogtie defendant and place him in the patrol car on his stomach after defendant engaged in violent behavior, such as kicking the doors of the car, banging his head on the divider, kicking an officer in the stomach, and consistently pulling free from the officers' restraints); Mayard v. Hopwood, 105 F.3d 1226, 1227-28 (8th Cir. 1997) (finding that placing defendant in a hobble restraint after violently resisting arrest was reasonable, but slapping, punching, and using a racial slur against defendant after she was handcuffed was not reasonable). Additionally, other Circuits that have examined analogous, even more severe, cases involving prone restraint and asphyxia have found the force used to be reasonable. See, e.g., Gregory v. County of Maui, 523 F.3d 1103, 1107-09 (9th Cir. 2008) (struggle with decedent did not amount to unreasonable force, as it was proportionate to the severity of the offense and threat he posed to the officers); Giannetti v. City of Stillwater, 216 F. App'x. 756, 765-66 (10th Cir. 2007) (finding no unreasonable force when officers placed hands and knees on

_____

[6]Although the Court notes that there do not appear to be any Eighth Circuit cases that involve positional asphyxia and the use of a prone restraint, the cases that the Eighth Circuit has addressed involve the use of other restraint techniques, such as a hogtie.

decedent, who continued to actively resist after being placed in a prone position);

Bornstad v. Honey Brook Twp., 211 F. App'x. 118, 123-25 (3d Cir. 2007) (finding that

placing a knee on decedent's chest and turning him over on his stomach did not constitute

unreasonable force when decedent was actively resisting arrest, even though he stated

that he was having trouble breathing); Wagner v. Bay City, Tex., 227 F.3d 316, 324 (5th

Cir. 2000) (finding no unreasonable force when officers sprayed decedent with pepper

spray, placed him face down on the ground, and placed a knee on the decedent's neck or

back while handcuffing him); Estate of Phillips v. City of Milwaukee, 123 F.3d 586, 593

(7th Cir. 1997) (finding that placing decedent on floor in prone position with hands and

legs restrained was not unreasonable force because it was necessary to protect the safety

of the officers and others present).

    This case is also consistent with the Court's entry of summary judgment in

Williams v. Chambers, No. 4:07CV01409 ERW, 2010 WL 481299, *12-13 (E.D. Mo.

Feb. 5, 2010).  In Williams, following erratic and violent behavior by Williams, the

defendants put Williams in the prone position and handcuffed him.  Id.  As soon as they

let up their pressure, he began to struggle and attempted to get up again.  Id.  The

defendants, therefore, continued to apply "just enough pressure" to Williams so that

Williams could not get up.  Id.  As with the present case, the defendants in Williams

immediately turned Williams over and sought medical treatment.  Id.  Despite their

efforts, Williams died from an  "Accident" and "Excited Delirium associated with

cocaine."  Id. at *9.  The court in Williams held that the force applied by the defendants

was entirely reasonable considering Williams' earlier erratic and violent behavior, and granted summary judgment in favor of the defendants.

The case cited by Plaintiffs in support of their opposition to Defendants' Motion for Summary Judgment is distinguishable from the case at hand. Plaintiffs cite <u>Champion v. Outlook Nashville, Inc.</u>, 380 F.3d 893, 902 -03 (6th Cir. 2004), to support the argument that the Defendants used unreasonable force in arresting Keith. However, in <u>Champion</u>, the officer conduct that the Sixth Circuit found to be unreasonable was specifically the use of pepper spray after the arrestee was handcuffed, hobbled, and under control. <u>Id.</u> In this case, on the other hand, Keith continued to resist arrest and attempt to get up, even after he was handcuffed and while Defendants were applying the leg shackles.

The Court expresses genuine remorse over the unfortunate outcome of the events underlying this case. However, "the mere fact that an injury occurred while an individual was in police custody is not sufficient to avoid summary judgment - a plaintiff must identify the *specific* unreasonable conduct that caused his or her injuries." <u>Abdullahi v. City of Madison</u>, 423 F.3d 763, 770-71 (7th Cir. 2005). Plaintiff has failed to establish such unreasonable conduct in this case and the Court finds that the actions of the Defendants did not amount to unreasonable force.

Because there was no constitutional violation, the Court need not reach the issue of whether the Defendants are entitled to qualified immunity. <u>See</u> <u>Williams</u>, 2010 WL481299 at *14.

### Count I: Substantive Due Process and Eighth Amendment Claims

Plaintiff Darrell Dyer has also alleged that Defendants' use of excessive force in arresting Keith violated Keith's rights under both the Fourth and Fourteenth Amendments. However, the Supreme Court has held that once a seizure occurs, the plaintiff's claims must be analyzed under the Fourth Amendment, not the Fourteenth Amendment. See County of Sacramento v. Lewis, 523 U.S. 833, 842-43 (1998); Graham v. Connor, 490 U.S. 386, 395 (1989); Helseth v. Burch, 258 F.3d 867, 872 n.4 (8th Cir. 2001) (en banc). The parties do not dispute that Defendants did in fact seize Keith, and Plaintiff's allegations of excessive force are therefore properly analyzed by the Court under the Fourth Amendment, as discussed above.[7]

Plaintiff's Eighth Amendment claim fails for similar reasons.[8] The Supreme Court has made explicit "that *all* claims that law enforcement officers have used excessive force –deadly or not–in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness'

---

[7] On these facts, the Court could not find a violation of substantive due process claim under the Fourteenth Amendment, in any event. The "substantive component of the Due Process Clause protects a private citizen against an abuse of power by an executive official that 'shocks the conscience.'" Helseth v. Burch, 258 F.3d 867, 870 (8th Cir. 2001) (en banc). Only an intent to cause harm unrelated to the legitimate object of arrest will satisfy the "shocks the conscience" test applied to actions such as high-speed pursuits. County of Sacramento, 523 U.S. at 854. Here, the Court finds that the only harm intended by Defendants' conduct was incidental to their legitimate objective of arresting Keith, which is not sufficient to establish a substantive due process violation under the Fourteenth Amendment.

[8] In their response to Defendants' motion, Plaintiffs withdrew any claims that Defendants violated the First, Fifth, Sixth, and Ninth Amendments. (Doc. 142 at 35.)

standard." Graham, 490 U.S. at 395 (emphasis in original). After a conviction, "the Eighth Amendment . . . serves as the primary source of substantive protection to *convicted prisoners* in cases . . . where the deliberate use of force is challenged as excessive and unjustified." Whitley v. Albers, 475 U.S. 312, 327 (1986) (emphasis added). As there is no dispute that the only force used against Keith was during his arrest, Defendants are also entitled to judgment on the Eighth Amendment claims in Count I.

### Counts II and III – Failure to Train Claims

In Count II, Plaintiff Darrell Dyer alleges a failure to train claim against Blankenship, and in Count III alleges a failure to train claim against the City of Doolittle and Jones. Plaintiff specifically alleges that these defendants' "employees are not adequately trained in the proper use of force in the apprehension of suspects; nor are they adequately trained in the monitoring of suspects' health and safety while in custody." (Doc. 60 at ¶¶ 63, 72.)

A Fourth Amendment seizure requires an intentional act by an officer, and does not address "accidental effects of otherwise lawful government conduct." Brower v. County of Inyo, 489 U.S. 593, 596-97 (1989). This Circuit has consistently recognized a general rule that, in order for municipal liability to attach, individual liability first must be found on an underlying substantive claim. See McCoy v. City of Monticello, 411 F.3d 920, 922 (8th Cir. 2005) (concluding because district court properly granted officer summary judgment on excessive force claim, the City could not be liable in

unconstitutional policy/custom theory or failure to train/supervise theory); <u>McVay v. Sisters of Mercy Health Sys.</u>, 399 F.3d 904, 909 (8th Cir. 2005) (stating "[s]ince we have found that [the officer's] actions were not unconstitutional, McVay cannot make a prima facie case against the City under section 1983"); <u>Turpin v. County of Rock</u>, 262 F.3d 779, 784 (8th Cir. 2001) (concluding because district court properly granted officers summary judgment on qualified immunity grounds, county likewise was entitled to summary judgment); <u>Veneklase v. City of Fargo</u>, 248 F.3d 738, 748 (8th Cir. 2001) (en banc) (declaring "where arresting police officers are absolved of liability to arrestees, the City ordinarily is not liable"); <u>Thomas v. Dickel</u>, 213 F.3d 1023, 1026 (8th Cir. 2000) (reasoning "[b]ecause we have found that the officers' stop of the plaintiffs' car did not violate their fourth amendment [ ] rights, it follows that the plaintiffs' claim against the city (inadequate training and municipal custom) must likewise fail"); <u>Eagle v. Morgan</u>, 88 F.3d 620, 628 (8th Cir. 1996) (declaring decision that officers' conduct did not violate plaintiff's constitutional right to privacy disposed of related claims against the city); <u>Abbott v. City of Crocker</u>, 30 F.3d 994, 998 (8th Cir. 1994) (holding city cannot be found liable on either a failure-to-train theory or a municipal custom/policy theory unless a defendant police officer is found liable on an underlying substantive claim).

The Court held above that Defendants' actions were "objectively reasonable," and did not constitute an unreasonable seizure violating Keith Dyer's constitutional rights. Therefore, Defendants Blankenship, the City of Doolittle, and Jones cannot be held liable on either an unconstitutional policy or custom theory or on a failure to train or supervise theory.  <u>McCoy</u>, 411 F.3d at 922.

**Count IX - Deprivation of Familial Relationship**

In Count IX Plaintiff Kevin Dyer alleged that Defendants violated his right to a familial relationship with Keith, pursuant to 42 U.S.C. § 1983. Defendants argue that they are entitled to summary judgment on this Count because Plaintiff failed to state a claim upon which relief may be granted.

Plaintiff concedes that the Eighth Circuit has not recognized a sibling's standing to assert a constitutional claim for a violation of the sibling's right to a familial relationship. Even were the Eighth Circuit to recognize such standing, here there is insufficient evidence to support such a claim. "'A defendant can be held liable for violating a right of intimate association only if the plaintiff shows an intent to interfere with the relationship.'" Reasonover v. St. Louis County, Mo., 447 F.3d 569, 585 (8th Cir. 2006) (quoting Singleton v. Cecil, 133 F.3d 631, 635 (8th Cir.1998)). Here, Plaintiff has presented no evidence that Defendants had an intent to interfere with Kevin's relationship with his brother.

**Counts IV, V, VI, VII, VIII - State Law Claims**

Plaintiff Darrell Dyer asserts state law wrongful death claims against Blankenship (Count IV), Jones (Count V), Curtis (Count VI), and Kirn (Count VII). He also alleges a state law claim of negligent hiring (Count VIII) against the City of Doolittle for failure to properly investigate Jones prior to hiring him as a Doolittle Police Department employee.

Without addressing the adequacy of Plaintiff's state law claims, the Court declines to exercise jurisdiction over them. Generally, this Court only has jurisdiction to

adjudicate claims based on either federal subject matter jurisdiction or diversity jurisdiction.  28 U.S.C. §§ 1331 & 1332.  However, a "federal court has jurisdiction over an entire action, including state-law claims, whenever the federal-law claims and state-law claims in the case derive from a common nucleus of operative fact and are such that a plaintiff would ordinarily be expected to try them all in one place." Carnegie-Mellon University v. Cohill, 484 U.S. 343, 349 (1988); see also 28 U.S.C. § 1367.  Upon a determination that Defendants are entitled to summary judgment on Plaintiff's federal claims, the Court has discretion to dismiss without prejudice Plaintiff's attendant state law claim.  See Miner v. Local 373, 513 F.3d 854, 866 (8th Cir. 2008); Willman v. Heartland Hospital East, 34 F.3d 605, 613-14 (8th Cir. 1994) (district court did not abuse discretion in declining to exercise jurisdiction over state law claims when it granted summary judgment to defendants less than two weeks before trial); Rushing v. Simpson, 2009 WL 4825196, *9 (E.D. Mo. Dec. 11, 2009) (discretionary dismissal of state law claims upon decision to grant summary judgment to defendants on federal claims).

Here, it appears that at least some of Plaintiff's state law claims may not withstand scrutiny, on grounds including official immunity.  However, the Court believes the better course is to permit the state courts to address these defenses, and as such, the Court, in its discretion, dismisses Plaintiff Darrell Dyer's state law claims without prejudice.

## Conclusion

For the foregoing reasons, the Court finds that Defendants are entitled to judgment as a matter of law on Counts I, II, III, and IX of the First Amended Complaint. The Court will also dismiss, without prejudice, Plaintiff's state law claims in Counts IV, V, VI, VII, VIII of the First Amended Complaint.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants Don Blankenship, William Scott Jones, the City of Doolittle, Greg Curtis, and Michael Kirn's Motion for Summary Judgment (Doc. 108) is **GRANTED in part, and DENIED in part**. Summary judgment is granted in favor of Defendants on Counts I, II, III, and IX of the First Amended Complaint.

**IT IS FURTHER ORDERED** that Plaintiff Darrell Dyer's state law claims in Counts IV, V, VI, VII, VIII of the First Amended Complaint are **DISMISSED without prejudice.**



AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 30th day of March, 2011.